IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

EDNA ANDERSON,
      Plaintiff,

vs.                                                   Case No. 5:06cv192/SPM/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.     PROCEDURAL HISTORY

      Plaintiff protectively filed an application for SSI benefits based on disability under Title XVI (Tr. 139, 147–49).[1]  The application was denied initially (Tr. 59, 79–82) and on reconsideration (Tr. 60–61, 84–87).  On February 28, 2005, an administrative law judge (ALJ) dismissed Plaintiff's

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on December 27, 2006 (Doc. 11).

request for a hearing based on the late filing of her request (Tr. 62–65).  On June 23, 2005, the Appeals Council of the Social Security Administration remanded Plaintiff's claim for a hearing, finding she was not at fault for the late filing of the request for a hearing (Tr. 98–101).  On April 25, 2006, following a hearing, an ALJ rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act (Tr. 12–24).  On August 18, 2006, the Appeals Council denied Plaintiff's request for review (Tr. 8–11).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).  This appeal followed.

II.    FINDINGS OF THE ALJ

On April 25, 2006, the ALJ made several findings relative to the issues raised in this appeal (Tr. 15–24):

1)    Plaintiff has not engaged in substantial gainful activity since the alleged amended onset of disability (October 1, 2001 (see Tr. 28)).

2)    Plaintiff's residuals of a history of cerebral vascular accident (CVA), hypertension, obesity, and a history of hernia repair are considered "severe" based on the requirements in the Regulations 210 C.F.R. § 416.920(c).

3)    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4)    Plaintiff's allegations regarding her limitations are not totally credible.

5)    Plaintiff has the residual functional capacity (RFC) for light and sedentary work on a sustained basis.

6)    Plaintiff is unable to perform any of her past relevant work (20 C.F.R. § 416.965).

7)    Plaintiff is a "younger individual" (20 C.F.R. § 416.963).

8)    Plaintiff has a "high school (or high school equivalent) education" (20 C.F.R. § 416.964).

9)    Plaintiff has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 C.F.R. § 416.968).

10)     Plaintiff has the RFC to perform a significant range of light and sedentary work (20 C.F.R. § 416.967).

11)     Although Plaintiff's exertional limitations do not allow her to perform the full range of light or sedentary work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs were properly identified by the impartial vocational expert at the hearing.

12)     Plaintiff was not under a "disability," as defined in the Act, at any time through April 25, 2006, the date of the ALJ's decision (20 C.F.R. § 416.920(g)).

## III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the

Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[2] the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment,

---

[2]In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits (DIB) or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, citations in this report and recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.     Personal History

Plaintiff was born on August 6, 1957 (Tr. 136).  When she applied for benefits in October 2001, she alleged an onset of disability date of June 16, 2001 (see Tr. 164, 172).  As grounds for disability, Plaintiff alleged that she "had 5 hernia in [her] stomach, pulled muscle in [her] heart and had two strokes in the past," and she had to stop working because her condition got worse (Tr. 164). In February 2003, she alleged an onset of disability date of August 1, 1995 (see Tr. 147).  As grounds for disability, Plaintiff alleged that she had a hiatal hernia; pain in her legs, arms, and shoulders; and suffered two light stokes — all of which, apparently, resulted in an inability to stand very long (Tr. 154).  Plaintiff also stated that her pain got so bad she had to stop working (id.).  In describing her medical history, Plaintiff noted that she had "pain in her stomach" and had undergone surgery (Tr. 156).

The file also contains several questionnaires on which Plaintiff described her pain and pain medications (see, e.g., Tr. 185–87).  In October 2001 Plaintiff reported pain around her heart, strong stomach pain from her hernias, and left-sided numbness from her strokes (Tr. 185).  As a result, she cannot bend over or stand long, and she sometimes feels like she is going to pass out (id.).  She claimed to experience pain "all the time," and stated that she takes muscle relaxers for her pain "as needed" and nitroglycerin for her heart (Tr. 185, 196).  Plaintiff noted that pain medications ease the pain, but her heart medication causes headaches, so she takes Tylenol which relieves her headaches "for a while" (Tr. 186, 197).  Plaintiff further noted that the nitroglycerin relives her chest discomfort in about twenty minutes, and she has not required any type of therapy other than medication (Tr. 186, 200).  Plaintiff also noted that her pain prevents her from performing some of her usual daily activities (Tr. 186).  For example, Plaintiff explained that it is hard to cook because she cannot stand long; personal care is difficult because it is hard to get out of the tub, and it hurts

her heart and  stomach; she can do a little housekeeping, but then she needs to sit and rest; laundry is difficult because "it's hard to take a basket of clothes [] outside" and she sometimes feels lightheaded; she can shop for only thirty minutes and then she has to sit down; it is hard to sleep on her left side and her stomach sometimes hurts at night; she drives "some," but usually has someone else drive for her; she cannot do outside work, such as gardening or yard work; she goes to church and fishing "when she can"; and she does some home maintenance, "but not much" (Tr. 186–87; *see also* Tr. 196–98 (similar responses on a pain questionnaire from October 2001)).

In a request for reconsideration made in or about February 2002, Plaintiff indicated that "the pain in [her] legs, arms, and shoulders is worse," she hurts all the time, and she now passes out "when [she] gets up quick" (Tr. 201, 204).  In another request for reconsideration made in or about March 2002, Plaintiff indicated that she "has pains constantly in [her] stomach" and had a "stroke on [her] left side" and therefore cannot obtain gainful employment (Tr. 71).  In April 2002, Plaintiff reported that she cannot stand due to pain in her back and legs, and she cannot cook because she is unable to stand due to pain and she forgets to turn off the stove (Tr. 207, 210).  She also claimed that she does "no activities at all," and she is no longer active in her church due to pain (Tr. 208).  She claimed to be very forgetful (Tr. 209).

Plaintiff next responded to a pain questionnaire in July 2002 (Tr. 211–13 ).  Plaintiff indicated that she had "pain all of the time," that everything caused pain, and she is never out of pain, but she also indicated that she was then taking only aspirin to relieve her pain.  In March 2003, Plaintiff indicated on a questionnaire that she has "severe pain in legs, left arm, and sometimes in [her] chest"; standing, bending, and walking most frequently cause pain, but sitting also caused "some" pain; her pain lasts only twenty to thirty minutes; her medications "take[] away some of the pain for a while," but they cause left-sided numbness and dizziness; she can cook and personally care for herself for about fifteen minutes; she can shop for about twenty minutes; and she no longer has any trouble sleeping (Tr. 237–39).  Finally, in September 2003, Plaintiff described "sharp pain in [her] chest, sometimes severe," and she noted that she cannot breathe "after walking just a little"; walking, reaching, and temperature conditions can cause her to be unable to breathe; she has pain two to three times a day, sometimes lasting twenty or twenty-five minutes; she was taking Darvocet for pain, and her medication was "very effective" in relieving her pain; and she has dizzy spells and

passes out (Tr. 251–53).  Finally, in September 2003, Plaintiff reported that she can walk half a mile, but then she has to stop due to shortness of breath; she also has chest discomfort, but it is relieved by the Darvocet within fifteen minutes (Tr. 255–56).

Plaintiff's hearing before the ALJ was held on January 12, 2006 (Tr. 25).  First, Plaintiff confirmed that her alleged onset of disability date is October 1, 2001 (Tr. 28).  She testified that she was forty-eight years old, widowed, and had one year of college education in child development, as well as certification as a CNA (Tr. 30–31).  She lives in a one-story house with her caretaker (Tr. 31–32).  She is approximately 5'9 and weighs 350 pounds (Tr. 32).  Plaintiff stated that she was last employed in May 2001 as a garbage truck driver, which required sitting, "getting in and out" of the truck, and lifting between 25 and 50 pounds at a time (Tr. 32–34).  Plaintiff previously worked as a caretaker/ CNA for about six or seven years (Tr. 34).  The CNA job required walking or standing for about three hours, sitting for about four hours, and lifting 100 pounds occasionally and fifty pounds frequently (Tr. 34–35).  As a CNA, Plaintiff described that she basically served as a live-in companion to bed-bound patients, helping them eat, bathe, and transfer from a bed to a wheelchair; she also cooked for her patients and transported them to medical appointments (Tr. 35–36).

Plaintiff testified that she quit working due to "health problems" (Tr. 36–37).  Specifically, Plaintiff stated that the main reason she cannot work is "[b]ecause [she] can't stand or sit long because [she] get[s] numb on [her] legs and feet" (Tr. 37).  The numbness in her legs occurs about two to three times per week, lasts about thirty minutes, and is relieved by massaging her legs "to get the circulation back" (Tr. 48–49).  Her feet and legs swell about every day or every other day, and she takes fluid pills for the swelling (Tr. 49).  Plaintiff initially testified that she can only sit for less than thirty minutes, although she acknowledged that she had been sitting longer than that during her hearing, and then she stated that she can sit for forty-five minutes before getting numb (Tr. 43).  Plaintiff also testified that she can stand for about fifteen or twenty minutes before she needs to sit down, and she can only walk less than half a mile (*id.*).  She cannot lift a gallon of milk or bend over to pick up something, but she can grasp with her hands, although she claims to have numbness in her fingers and hands — even though she has never reported this to any physician (Tr. 44).  On a typical day Plaintiff gets up at 7:00 or 7:30 and spends 90 percent of her day in a recliner, and she may spend an hour on the computer (Tr. 45–46).  Someone cooks for her, and she does no

housework, although Plaintiff sometimes drives, and she attends church two to three times a week (one service is an hour and the other is an hour and a half) (Tr. 45, 47–48).  She has had a live-in caretaker for five years (Tr. 45–46).  Plaintiff takes care of her personal needs but needs assistance showering (Tr. 48).  Plaintiff noted that she sees her primary care physician every six months and is treated for high blood pressure (HTN) and "[her] heart and for the excess fluid around [her] heart" (Tr. 37).  Plaintiff takes medication for each condition, and she noted that her conditions are "stable" with the medication (Tr. 39, 42).  Plaintiff was hospitalized in August 2003 for two and a half days, but she did not follow up with a cardiologist and she was not referred to any specialist after her discharge (Tr. 38, 42).  Plaintiff testified that she has not been hospitalized or been to an emergency room since 2003, and she has had no diagnostic tests since 2003 (Tr. 37–38).  In addition to Plaintiff's HTN and heart condition, she testified that she gets lightheaded and passes out (Tr. 41).  Her physician has recommended that she lose weight, and she has lost about ten pounds in the last four months (approximate) (*see id.*).  Plaintiff has been using a cane for balance for the last four years, but it was not prescribed to her (*id.*).  Finally, Plaintiff testified that there were no "other symptoms or any other problems [other than those discussed during her hearing] that would affect [her ability to] work" (Tr. 49).

B.    Relevant Medical History[3]

Plaintiff reported having two transient ischemic attacks (TIA) from 1995 through 2001.  Doctors' Memorial Hospital records and treatment records from Mohammad Yunus, M.D., show treatment for a possible Transient Ischaemic Attack (TIA) with left hemiplegia in August 1995.  However, a CT scan of the head from August 14, 1995, showed no mass effect and no indication of hemorrhage or infarction with normal ventricles and "no obvious acute abnormality demonstrated" (Tr. 279–81, 283–87).[4]  Although Plaintiff was diagnosed with a TIA with left hemiplegia at the time of discharge, treatment records confirm that she was much improved, and the evidence suggests a complete recovery from this isolated incident (Tr. 283–87, 292–93, 490–98).

_____

[3]Unless otherwise indicated, Plaintiff's medical history is derived from the ALJ's opinion (*see* Tr. 18–19).

[4]Although the ALJ's summary of Plaintiff's medical history references exhibits, the undersigned has provided the corresponding pages of the transcript instead of the Exhibit Numbers (*e.g.*, Exhibits 2F and 4F, referenced by the ALJ, can be found at Tr. 279–81 and Tr. 283–87).

Plaintiff was hospitalized on January 30, 2001 for chest pain, which was determined to be secondary to pleurisy and acute bronchitis.  Diagnostic testing was unremarkable (Tr. 294–98).

Emergency room notes from Doctors' Memorial Hospital dated May 27, 1998 and September 17, 1999, show treatment for Plaintiff's complaints of back pain, which resulted in a diagnosis of lumbar "strain."  However, these records fail to disclose any findings of "significant" abnormality of the lumbar spine (Tr. 283–87, 288–91).  As noted by Plaintiff, the x-ray dated September 17, 1999, did show a small spur formation at L1 and L4 (Doc. 21 at 3), but otherwise the x-ray was normal.  Indeed, the reviewing physician noted "normal vertebral body height and alignment with well preserved intervertebral disc spaces, neural foramina, spinous and transverse processes as well as sacroiliac joints.  No bony fracture, dislocation, spondylolysis or spondylolisthesis." (Tr. 290).  Additionally, as noted by Plaintiff, the physician reported that "[a] condition like acute muscle spasm and disc injury cannot be ruled out on plain films" (Doc. 21 at 3), but his impression remained simply that of "small spur formation . . . of L1 and L4 vertebral bodies" (Tr. 290).  Later records from Doctors' Memorial Hospital include an emergency room visit from January 2001, when Plaintiff was admitted with complaints of sharp, left-sided chest pain and lightheadedness (Tr. 294).  Diagnostic testing was normal, and Plaintiff was discharged the next day after reporting that she had no chest pain (*id.*).  On November 20, 2001, Plaintiff was again seen for complaints of chest pain.  Once more, diagnostic testing (which included lab reports, an electrocardiogram (EKG), and a chest x-ray) was completely normal (Tr. 346–52).

Flowers Hospital records from December 12, 1995 through April 17, 2001, show treatment for abdominal pain and confirm treatment for a ventral hernia which apparently resulted from Plaintiff's earlier repair of an umbilical hernia (Tr. 299–327).  Diagnostic testing from this facility, including a CT scan of the abdomen and pelvis, x-rays, and lab reports, all failed to show any other significant abnormalities (Tr. 282, 299–327).

General surgeon, Stephen Fendley, M.D., laparoscopically repaired an "incarcerated incisional hernia with mesh" on September 6, 2000 (Tr. 333).  His treatment notes indicate that Plaintiff made a full recovery from this hernia repair without significant problems other than some reports of occasional stress urinary incontinence for which she was referred to W.C. Shelor, M.D., a urologist (Tr. 328–45).  Dr. Shelor noted on January 24, 2000 that Plaintiff did not want to proceed

with surgery as the incontinence did not normally bother her and primarily occurred when she had "a cold and cough" (Tr. 336). Dr. Fendley's treatment notes include an abdominal CT scan, which was consistent with the finding of an incisional hernia prior to the above-noted repair, and normal lab reports (Tr. 328–45).

Plaintiff has a history of hypertension and morbid obesity (Tr. 277–78, 299–327, 417–25). However, there has consistently been no objective medical evidence of any end organ damage. Moreover, Plaintiff's elevated blood pressure appears to be controllable when she uses her medications as prescribed (Tr. 370–81, 417–25).

Despite Plaintiff's reports of coronary problems, Northwest Florida Community Hospital treatment records from January 24, 1998 through June 2, 2002, include normal EKGs from various dates (Tr. 365–69). Treatment records from Campbellton-Graceville Hospital dated April 8, 1997 through July 31, 2003, likewise include some, but very limited, evidence of any physical abnormalities (Tr. 382–416, 438–66). For example, an ultrasound of Plaintiff's spine from November 30, 1998, showed "mild long arched dextroscoliosis on AP projection, which could be structural, positional, or secondary to muscle spasms" (Tr. 407; *see also* Doc. 21 at 3), but the ultrasound also revealed normal height and alignment of vertebral bodies on lateral view, as well as normal intervertebral disc spaces, neuroforamina, spinous process, transverse process, and sacroiliac joints (Tr. 407). Although Plaintiff had some slightly abnormal "CBC" testing and reports of a nonspecific T-wave abnormality shown by ECG, other testing was essentially normal, including chest x-rays, Doppler study, and additional laboratory testing. Later EKGs from January 16, 2003 were also notably "normal" (Tr. 417–25).

Plaintiff was hospitalized in July 2003 for expected early congestive heart failure, but she was released with a diagnosis of long-standing history of hypertension, marked exogenous obesity, past history of abdominal wall herniations, a urinary tract infection, and probable mild anxiety and/or depression <u>without evidence</u> of congestive heart failure (Tr. 438–66).[5]

---

[5]Thus, the ALJ noted that the objective medical evidence does not show a confirmed diagnosis of congestive heart failure or any significant coronary artery disease (Tr. 19).

More recently, in July 2005, Plaintiff was seen at Campbellton-Graceville Hospital for complaints of chest pain and then upon follow-up for the same problem. Plaintiff apparently had an argument with her son and reported having developed this chest pain. A complete cardiac work-up failed to show any significant abnormalities. Plaintiff was assessed with non-cardiac chest pain, which resolved with the administration of mild pain medication, and she reported having no further episodes upon follow-up (Tr. 501–25).

C.       Other Information Within Plaintiff's Claim File

A physical examination by Kris Lewandowski, M.D., on January 2, 2002, revealed no significant abnormal findings. Dr. Lewandowski specifically noted that Plaintiff had reported "intermittent numbness of the left upper and lower extremity, abdominal pain and syncopal episodes," but he also noted that "[t]here are basically no medical records which can substantiate her complaints. Indeed, as conceded by Plaintiff, "Dr. Lewandowski attributed no weight to [Plaintiff's] claims" (Doc. 21 at 6). Dr. Lewandowski noted that Plaintiff "appears to be quite healthy and has no major functional impairment" (Tr. 354). Plaintiff walked and sat without any problems and clearly demonstrated full ranges of motion in all areas tested, including the cervical and lumbar spine and with her upper and lower extremities (Tr. 353–56).

A more recent medical examination by Sam Banner, M.D., on May 20, 2003, also produced normal ranges of motion and no evidence of any muscle atrophy or significant motor weakness upon physical examination (Tr. 426–29). Based upon Plaintiff's reports, Dr. Banner gave a diagnosis of "CVA x 2," morbid obesity, hypertension and multiple hernia/abdominal repairs (Tr. 429). However, Dr. Banner noted that Plaintiff had no evidence of muscle spasm in the spine or extremities, and she was able to get on and off the examining table without significant problems (*see* Tr. 428). He failed to identify any significant limitations but noted that Plaintiff will need long-term medical care, although he did not clarify what he meant by this statement (Tr. 429).

The file also contains Physical RFC Assessments completed by agency physicians. For example, an assessment was completed by J. Patrick Neal, M.D., on January 18, 2002 (Tr. 357–64). Dr. Neal opined that Plaintiff was able to frequently lift or carry twenty-five pounds and occasionally lift or carry fifty pounds. She could stand, walk, or sit six hours in an eight-hour workday (Tr. 358). Her ability to push or pull was unlimited, other than by her ability to lift or carry

(*id.*).  No postural, manipulative, visual, or communicative limitations were noted (Tr. 359–61).
Plaintiff was to avoid concentrated exposure to extreme cold and heat, wetness, humidity, noise,
vibration, fumes, odors, gases, poor ventilation, as well as heights or hazardous machinery (Tr. 361).
Additionally, on June 11, 2003, Todd A. Patterson, D.O., opined that Plaintiff was able to lift or
carry twenty pounds occasionally and ten pounds frequently, and she could sit, stand, or walk six
hours in an eight-hour workday (Tr. 431).  Her ability to push or pull was unlimited in all extremities
except her left hand, which was somewhat limited (*id.*).  Plaintiff could frequently balance and climb
ramps or stairs, but she could never climb ladders, ropes, or scaffolds, and she could occasionally
stoop, kneel, crouch, or crawl (Tr. 432). Plaintiff was limited in gross and fine manipulation to the
extent that she has decreased grip strength and dexterity in her left hand (*see* Tr. 431, 433).  No
visual or communicative limitations were noted, but Plaintiff was to avoid concentrated exposure
to hazards such as machinery or heights (Tr. 433–34).  A third assessment was completed, but it is
not dated or signed (*see* Tr. 489).  Nevertheless, similar conclusions were reached (*see* Tr. 482–89).

Finally, a vocational expert (VE) testified at Plaintiff's hearing on January 12, 2006 (*see* Tr.
25, 49–55).  The VE first testified that Plaintiff's past work as a garbage truck driver and CNA are
classified as "medium," and her job as a companion would normally be classified as "light," but
based on Plaintiff's description of her companion work he would classify it as "heavy" (Tr. 53).  The
ALJ then posed two hypothetical questions to the VE.  First, the ALJ asked:

> Let's assume that I find from the objective medical evidence, testimony, legal
> arguments and other credible medical evidence that in the course of an eight-hour
> day [Plaintiff] can sit six hours, stand up to six hours; lift up to 20 pounds
> occasionally, 10 pounds frequently.  She would not be able to climb ladders or work
> at heights or around dangerous machinery.  Considering these restrictions and
> limitations, could she perform any of her past relevant work either as performed by
> her or as it is described in the national economy?

(Tr. 53–54).  In response, the VE indicated that Plaintiff could perform the job of companion, as it
is described in the <u>Dictionary of Occupational Titles</u>, but could not perform the job of companion
as it was described by Plaintiff (Tr. 54).  Second, the ALJ asked:

> Let's assume that in the course of an eight-hour day [Plaintiff] can sit up to six hours
> and she could be able to stand two to three hours; lift 10 pounds occasionally; not do
> any climbing, work at heights or around dangerous machinery.  Considering these

restrictions and limitations, would she be able to perform any of her past relevant
work?

(Tr. 54).  In response, the VE indicated that Plaintiff could not return to any of her past work, but
she could perform other available jobs, including calendar control clerk, time keeper, voucher clerk,
maintenance clerk, maintenance scheduler, and appointment clerk, all of which are classified as
"sedentary" (Tr. 54–55).

V.     DISCUSSION

Plaintiff raises two issues on appeal.  First, Plaintiff contends the ALJ erred in failing to give
proper weight to Plaintiff's testimony concerning her pain.  Next, Plaintiff contends that based upon
a subsequent application for benefits, which resulted in Plaintiff being found disabled, this case
should be remanded with instructions to consider the onset date of Plaintiff's disability.   The
Commissioner asserts that the ALJ did not err and that no basis exists for a remand.

A.     Pain Testimony

As this court is well aware, pain is treated by the Regulations as a symptom of disability.
Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on
symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical
condition that could be reasonably expected to produce these symptoms."  *Accord* 20 C.F.R. §
416.929.  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted
the following additional pain standard:

There must be evidence of an underlying medical condition and (1) there must be
objective medical evidence to confirm the severity of the alleged pain arising from
the condition or (2) the objectively determined medical condition must be of a
severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219
(11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd.,
921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991);
Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard
set out in 20 C.F.R. § 404.1529 or § 416.929, because those regulations "contain[] the same
language regarding the subjective pain testimony that this court interpreted when initially

establishing its three-part standard." *See* <u>Wilson</u>, *supra*, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the <u>Hand</u> standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." <u>Elam</u>, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence." <u>Marbury v. Sullivan</u>, 957 F.2d 837, 839 (11th Cir. 1992) (citing <u>Walker v. Bowen</u>, 826 F.2d 996, 1003 (11th Cir. 1987)).  However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  *Id.*; <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." <u>MacGregor</u>, 786 F.2d at 1054; <u>Holt</u>, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  <u>Jones v. Department of Health and Human Services</u>, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the <u>Hand</u> standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." <u>Scharlow v. Schweiker</u>, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[6]  People with objectively identical conditions can experience

---

[6]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  <u>Bonner v. Pritchard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." Hand, *supra,* at 1548-49. It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence." Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).  Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that. The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

In the instant case, Plaintiff appears to assert that the ALJ erred by not following the Eleventh Circuit's pain standard (pain standard) and in failing to credit her testimony regarding her physical limitations.[7]

Initially, the court notes that the ALJ specifically referred to 20 C.F.R. § 416.929 before analyzing Plaintiff's complaints; thus, he obviously recognized and applied the correct pain standard (Tr. 17).  Next, the ALJ described Plaintiff's statements concerning the effect of her impairments on her ability to work and concluded that her statements were "not entirely credible in light of the medical history, the reports of treating and examining practitioners, the degree of medical treatment required, and [Plaintiff's] own description of her activities and lifestyle" (Tr. 17).  The ALJ then identified portions of the record to support his conclusion regarding Plaintiff's credibility.

The ALJ considered that Plaintiff's surgeon refused to provide a note stating that she could not work (Tr. 20).  Indeed, the record reflects that on September 12, 2001, Dr. Fendley reported that Plaintiff requested a work excuse; however, Dr. Fendley "told her 'no'" (Tr. 328).  The ALJ also noted that an examining physician indicated that Plaintiff had no "significant abnormal findings upon physical examination," and he referenced the findings of Dr. Lewandowski, who performed

---

[7]Plaintiff's brief is particularly unhelpful.  Plaintiff labels her first issue on appeal as, "Whether the Commissioner Erred as a Matter of Law in Failing to Give Proper Weight to the Pain Testimony of the Claimant." (Doc. 21 at 9).  Plaintiff then briefly recites the pain standard and summarizes Plaintiff's reported limitations.  No argument or analysis of any type follows — Plaintiff simply moves on to her second issue on appeal.

a consultative examination on January 2, 2002, as described *supra*, and who concluded that no medical records existed to substantiate Plaintiff's complaints (Tr. 19, 353–56). Next, the ALJ noted that despite Plaintiff's alleged heart problems, a complete cardiac work-up completed in 2005 showed no significant abnormalities, Plaintiff was assessed with non-cardiac chest pain, and her condition resolved with mild pain medication (Tr. 19, 503–11). Furthermore, medical records from Northwest Florida Community Hospital dated from January 24, 1998, through June 2, 2002, included normal EKGs (Tr. 366–68). Likewise, an EKG taken in January 2003 was normal (Tr. 19, 420–21). Additionally, the ALJ noted Plaintiff's report of CVAs, but he pointed out that the objective medical evidence does not indicate that Plaintiff suffered irreparable damage from either reported attack (*see* Tr. 18–19, 283–87, 292–93, 490–98).

In further discounting Plaintiff's complaints, the ALJ considered Plaintiff's activities of daily living and the fact that Plaintiff did not require the regular use of pain medication (Tr. 20). Plaintiff testified that she went to church two to three times per week (Tr. 20, 48). She also read and worked on the computer an hour a day, and she stated she visited friends and family (Tr. 21, 46–47). The ALJ may consider such daily activities when evaluating subjective complaints of disabling pain and other symptoms. *See* Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 416.929(c)(3). With regard to pain medication, the ALJ specifically noted that Plaintiff "has not required regular use of pain medications and has relied primarily on non-prescription 'over-the-counter' medications for her treatment" (Tr. 20). Indeed the record reflects that Plaintiff took aspirin to relieve pain and Tylenol for headaches (*see, e.g.*, Tr. 196, 211). Although Plaintiff indicated that she sometimes took stronger pain medication, such as Darvocet, she also indicated that such medication was "very effective" (Tr. 251–52). Further, Plaintiff testified that medication made her conditions "stable" (Tr. 42). "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (quoting Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987) (footnote omitted)).

Thus, because the ALJ articulated the inconsistencies on which he relied in discrediting Plaintiff's testimony regarding her subjective complaints, and because the ALJ's credibility finding is supported by substantial evidence on the record as a whole, the ALJ's credibility finding should

be affirmed.  *See* <u>Foote</u>, 67 F.3d at 1561–62.  A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court.  *See id.*

B.      Plaintiff's Request for Remand

Plaintiff asserts that she was found disabled as of June 20, 2006 after filing a subsequent application for disability benefits (Doc. 21 at 11).  Thus, according to Plaintiff, this case should be remanded "with instructions to consider the onset date of [Plaintiff's] disability" (*id.*).

In the instant case, Plaintiff alleged disability as of October 1, 2001, and the ALJ rendered his decision finding her not disabled on April 25, 2006 (*see* Tr. 24, 28).[8]  It is this court's responsibility to review "the decision of the ALJ as to whether the claimant was entitled to benefits during a specific period of time, which period [i]s necessarily prior to the date of the ALJ's decision."  <u>Wilson v. Apfel</u>, 179 F.3d 1276, 1279 (11th Cir. 1999) (per curiam).  Thus, evidence that Plaintiff was later found disabled indicates only that her condition worsened after April 25, 2006, the date of the ALJ's decision   The relevant period for this court's consideration is the time-period <u>prior</u> to the ALJ's decision.

Moreover, sentence six of 42 U.S.C. § 405(g), provides that the district court may remand the case to the Commissioner for "additional evidence to be taken before the Commissioner . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  Evidence of Plaintiff's deterioration was obviously presented in her subsequent application, but it has not been presented here.  Indeed, Plaintiff has not presented or identified <u>any additional evidence</u> — other than her assertion that she was subsequently awarded benefits — thus, there is no basis for a remand under sentence six.[9]

Finally, the Commissioner's regulations provide that an application is only effective through the date of the ALJ's decision, *see* 20 C.F.R. §§ 416.330, 416.335, and as discussed above, the

---

[8]Plaintiff has not indicated, nor is the court aware of, the alleged onset date contained in Plaintiff's subsequent application.  Nevertheless, it has no bearing on the undersigned's recommendation.

[9]Sentence four of section 405(g) states that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  Sentence four is not applicable in the instant case, as Plaintiff seeks remand on the basis of information that is <u>not</u> contained in the record before this court.

medical records in this case clearly establish that Plaintiff was not disabled prior to the date of the ALJ's decision.  Thus, the subsequent award of benefits does not require remand.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560.  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 9th day of November 2007.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**